FILED

2005 Jun-20  PM 04:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| SARAH E. CLOPTON<br>and S.T. STINSON,<br>on behalf of themselves and a<br>class of persons described herein,<br><br>    Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY;<br>PHARMACIA CORPORATION;<br>PFIZER, INC.; and SOLUTIA,<br>INC.,<br><br>    Defendants. | CASE NO.: CV-03-C-3369-S<br>and related cases<br><br>OPPOSED<br><br><br><br>JURY TRIAL DEMANDED |

---

## PLAINTIFFS' BRIEF IN SUPPORT
## OF CLASS CERTIFICATION

---

D. Frank Davis, Esq.
John E. Norris, Esq.
G. Renée Dall, Esq.
DAVIS & NORRIS
One Highland Place
2151 Highland Avenue
Suite 100
Birmingham, AL 35205
Telephone: (205) 930-9900

Robert B. Roden, Esq.
SHELBY & RODEN
2956 Rhodes Circle
Birmingham, AL 35205
Telephone: (205) 933-8383

Josh Wright, Esq.
HOLLIS & WRIGHT, P.C.
Ste. 1750 Financial Center
505 North 20th Street
Birmingham, AL 35203
Telephone: (205) 324-3600

Earl P. Underwood, Jr., Esq.
LAW OFFICES OF
  EARL P. UNDERWOOD, JR.
Post Office Box 969
Fairhope, AL 36533
Telephone: (251) 990-5558

Annesley H. DeGaris, Esq.
CORY, WATSON, CROWDER &
  DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 35205
Telephone: (205) 328-2200

Attorneys for Plaintiffs

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Overview Of The Parties And The Use Of PCBs
           Giving Rise To Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . .4

    B.    Defendants Produced And Improperly Disposed Of PCBs . . . 6

    C.    Defendants Knew Of The Hazards Of PCBs . . . . . . . . . . . . . . 8

    D.    Defendants Knew That They Were Polluting The Land
           Surrounding The Anniston Plant . . . . . . . . . . . . . . . . . . . . . .9

    E.    Defendants Made Efforts To Conceal The Existence
           And Hazards Of PCBs . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    F.    Defendants' Continued Pollution Of The Waters
           And Land, And The Lasting Effects Of PCBs . . . . . . . . . . . 17

    G.    The "Buy Out" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

    H.    Plaintiffs' Health And Property Have Been
           Detrimentally Impacted By Defendants' Tortious
           And Wrongful Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.    Plaintiffs Have Satisfied The Predominance And
           Superiority Requirements Of Rule 23(b)(3) . . . . . . . . . . . . 22

        1.    Common Questions Of Law And Fact Predominate . . .22

        2.    A Class Action Is Superior To Any Other
               Method Of Adjudication Of This Matter . . . . . . . . . . .28

B.    Plaintiffs Have Satisfied Each Of The Four Factors
      Contained In Rule 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

      1.    The Class Is So Numerous That Joinder Of All
            Members Is Impracticable . . . . . . . . . . . . . . . . . . . . . . .33

      2.    There Are Questions of Law Or Fact Common
            To The Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      3.    The Claims And Defenses Of The
            Representative Plaintiff Are Typical Of The
            Claims And Defenses Of The Class . . . . . . . . . . . . . . 35

      4.    The Representative Plaintiffs Will Fairly
            And Adequately Protect The Interest Of The Class . . . 36

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

**Cases**

Allapattah Servs. v. Exxon Corp.,
        333 F.3d 1248 (11th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Cook v. Rockwell Int'l Corp.,
        151 F.R.D. 378 (D. Colo. 1993) . . . . . . . . . . . . . . . . . . . . . . . .3, 26-27

Cooper v. Southern Co.,
        390 F.3d 695 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Cox v. Am. Cast Iron Pipe Co.,
        784 F.2d 1546 (11th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Drayton v. Western Auto Supply Co.,
        2002 WL 32508918 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . .36-37

Fitts v. Minn. Min. & Mfg. Co.,
        581 So.2d 819 (Ala. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

Gonzales v. Cassidy,
        474 F.2d 67 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Hudson v. Delta Air Lines, Inc.,
        90 F.3d 451 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

In Re Copley Pharmaceutical, Inc.,
        158 F.R.D. 485 (D.C.Wyo. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 27

In re HealthSouth Corp. Sec. Litig.,
        213 F.R.D. 447 (N.D.Ala. 2003) . . . . . . . . . . . . . . . . . . . . . . . 33, 34

In re School Asbestos Litig.,
        789 F.2d 996 (3rd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . .2, 25-26, 28

In re Asbestos School Litig.,
        104 F.R.D. 422 (E.D.Pa. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

In re Theragenics Corp. Secs. Litig.,
     205 F.R.D. 687 (N.D.Ga. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

Kirkpatrick v. J.C. Bradford & Co.,
     827 F.2d 718 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Klay v. Humana, Inc.,
     382 F.3d 1241 (11th Cir. 2004) . . . . . . . . . . . . . . . . . 3, 22, 23, 31, 35

Kornberg v. Carnival Cruise Lines, Inc.,
     741 F.2d 1332 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Kreuzfeld A.G. v. Carnehammar,
     138 F.R.D. 594 (S.D.Fla.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Mejdrech v. Met-Coil Systems Corp.,
     319 F.3d 910 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

Olden v. LaFarge Corp.,
     383 F.3d 495 (6th Cir. 2004), . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25

Oullette v. Int'l Paper Co.,
     86 F.R.D. 476 (D.Vermont 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 27

Senter v. Gen. Motors Corp.,
     532 F.2d 511 (6th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

Siegel v. Realty Equities Corp. of N.Y.,
     54 F.R.D. 420 (S.D.N.Y. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . .39

Sterling v. Velsicol Chem. Corp.,
     855 F.2d 1188 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . 2, 24, 28

United States Parole Comm'n v. Geraghty,
     445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

Watson v. Shell Oil Co.,
     979 F.2d 1014 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>Yslava v. Hughes Aircraft Co.</u>,
    845 F.Supp. 705 (D.Ariz. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

**Other Authorities**

Fed. Rule Civ. P. 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

Fed. Rule Civ. P. 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Fed. Rule Civ. P. 24(c)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

Marc Galanter, <u>Why the "Haves" Come out Ahead: Speculations on the
    Limits of Legal Change</u>, 9 L. & Soc'y Rev. 95 (1974) . . . . . . . . . . . .30

1 Alba Conte & Herbert B. Newberg, <u>Newberg on Class Actions</u> § 3.10
    (4th ed. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

3 Alba Conte & Herbert B. Newberg, <u>Newberg on Class Actions</u> § 7.24
    (4th ed. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

David Rosenberg, <u>Individual Justice and Collectivizing Risk-Based Claims
    In Mass Exposure Cases</u>, 71 N.Y.U. L. Rev. 210 (1996) . . . . . . .30-31

David Rosenberg, <u>Mass Tort Class Actions: What Defendants Have and
    Plaintiffs Don't</u>, 37 Harv. J. Legis. 393, 404 (2000) . . . . . . . . . . . . 30

7A Charles A. Wright et al., <u>Federal Practice and Procedure</u> 3d. § 1778
    (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

7A Charles A. Wright et al., <u>Federal Practice and Procedure 3d.</u> § 1764
    (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SARAH E. CLOPTON<br>and S.T. STINSON,<br>on behalf of themselves and a<br>class of persons described herein, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | **CASE NO.: CV-03-C-3369-S**<br>**and related cases** |
| v. | ) ) | **OPPOSED** |
| MONSANTO COMPANY;<br>PHARMACIA CORPORATION;<br>PFIZER, INC.; and SOLUTIA,<br>INC., | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF CLASS CERTIFICATION

Plaintiffs submit the following, as well as the Evidentiary Materials In Support Of Class Certification filed contemporaneously herewith, in support of plaintiffs' Motion For Class Certification:

### I.

### INTRODUCTION

Plaintiffs seek a class action consisting of individuals that defendants exposed to the now-outlawed human carcinogen, polychlorinated biphenyls

("PCBs") and who have not previously been plaintiffs in settled cases.
Specifically, plaintiffs seek to represent:

> All persons who have sustained personal injury and/or property
> damage due to defendants' manufacture and disposal of PCBs from
> their West Anniston, Alabama plant. Specifically excluded from the
> class are all persons whose claims against the defendants have been
> settled or adjudicated.

Plaintiffs propose as class representatives Sarah E. Clopton and S.T. Stinson.
Upon certification, the plaintiffs propose to add, subject to the Court's approval, at
least three additional class representatives in order to reflect the broad diversity of
the thousands of persons in the class.

The law is well-settled that mass tort cases are suited for class action
treatment. Specifically, federal courts routinely find common questions of law and
fact to predominate in a wide range of toxic tort cases where damages are deemed
individual. Sterling v. Velsicol Chemical Co., 855 F.2d 1188 (6th Cir. 1988)
(affirming class certification of action against a chemical corporation for personal
injuries and property damage resulting to residents who lived near the
corporation's chemical waste burial site); Olden v. LaFarge Corp., 383 F.3d 495
(6th Cir. 2004) (affirming class certification of action brought by homeowners
against the owner of a cement manufacturing plant, alleging personal and property
damage caused by toxic pollutants originating from the plant); In re School
Asbestos Litig., 789 F.2d 996 (3rd Cir. 1986) (affirming 23(b)(3) class certification

in a lawsuit brought by school districts seeking compensatory and punitive damages, as well as injunctive relief, stemming from compliance with the Asbestos School Hazard Detection and Control Act); Cook v. Rockwell Int'l Corp., 151 F.R.D. 378 (D. Colo. 1993) (certifying class of property owners near a federal weapons production facility against the facility operators for damages sustained to the environment and their health allegedly caused by the release of radioactive and nonradioactive substances).

Consistent with this emerging nationwide trend, just last September the Eleventh Circuit sounded the death knell in this circuit for the age-old defense argument that class certification is improper where there are substantial individual damages issues. Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004). In Klay, a unanimous panel of the Eleventh Circuit affirmed the district court's certification of a nationwide class of over 600,000 physicians alleging violations of the federal civil RICO statute, in connection with major U.S. health care insurers' alleged refusal to make full payment for the physicians' professional services, despite massive issues of individual damages, because "the fact that damages must be calculated on an individual basis is no impediment to class certification." 382 F.3d at 1259.

This case fits squarely into the category of cases for which Rule 23 was designed. There are thousands of plaintiff class members. There are numerous

critical common questions of fact and law.   Indeed, *all* of the liability-related factual and legal issues are common ones.   The common liability issues dwarf the individual damages issues.   The class device is far superior to other available methods of adjudicating these thousands of claims.   We flesh out all of these reasons for granting class certification, and more, in the pages that follow.

## II.

## RELEVANT FACTS

The following statement of facts is drawn from Plaintiffs' Complaint and the evidentiary materials submitted contemporaneously herewith in support of Plaintiffs' Motion For Class Certification.

### A.   Overview Of The Parties And The Use Of PCBs Giving Rise To Plaintiffs' Claims

Monsanto Company[1] was the sole manufacturer of toxic substances known as polychlorinated biphenyls, or "PCBs," in the United States.   (Compl. ¶ 22).   All PCBs manufactured by Monsanto in this country were manufactured at two plants – one in Anniston, Alabama, and the other in Sauget, Illinois.   (Id.).   From the

---

[1]     For convenience, we refer to the defendants collectively as "Monsanto" or "defendants" throughout this brief.   Technically, the Anniston Plant is now owned and operated by Solutia, which was created in 1997 as a spin-off of Monsanto Company.   (Compl. ¶ 16).   In 2000, Monsanto Company was merged into and became a part of Pharmacia Corporation.   The current (and new) Monsanto Company is a 2001 spin-off of Pharmacia.   (Id.).   Pharmacia Corporation and Pfizer, Inc. merged and combined operations in 2003; Pharmacia Corporation is now a wholly-owned subsidiary of Pfizer, Inc.   (Id.).

plant in Anniston, toxic and hazardous chemicals or pollutants were released for many years into Snow Creek, and thus into Choccolocco Creek, as well as the tributary ditches leading into both creeks, and the soil and surface water in or on property owned by plaintiffs. This activity thereby proximately causing injury and damage to plaintiffs and plaintiffs' property. (Compl. ¶ 13). The present action concerns the defendants' pollution of neighborhoods surrounding their Anniston, Alabama plant, with PCBs. (Compl. ¶ 21). PCBs are carcinogenic materials that defendants manufactured for use as insulation in electrical transformers and for other commercial purposes such as pesticides, hydraulic fluid, paint, newsprint, and coils in deep fat fryers. (Id.). The electrical industry favored PCBs because they were non-flammable and could conduct heat without conducting electricity. (Id.). Dioxin, 2, 3, 7, 8-Tetrachlorodibenzo-*p*-dioxin (TCDD), Chlorinated dibenzofurans (CDFs), and other structurally related groups of chemicals from the family of halogenated aromatic hydrocarbons are known by-products of the manufacturing of PCBs. (Id.). These chemicals are among the most toxic substances known. (Id.).

PCBs are hazardous to humans and the environment. (Compl. ¶ 24). PCBs remain toxic and do not readily break down in the environment. (Id.). As detailed below, numerous tests and empirical evidence show that PCBs cause cancer, neurological deficits, liver disease, adverse skin conditions, and other maladies in

humans, as well as disease and death of several species of wildlife (some to the point of extinction). (Id.). Because of the longevity of PCBs and their hazardous effects on humans and the environment, the United States government officially banned production of PCBs in the 1970s. (Compl. ¶ 25).

Defendants had superior knowledge concerning PCBs and the manufacture and disposal of PCBs. (Compl. ¶ 23). At all relevant times, defendants knew the PCBs they manufactured were contaminated with TCDD, CDFs, and other by-products of the manufacturing process. Defendants intentionally suppressed the true facts regarding the toxicity of PCBs and related by-products. (Compl. ¶ 21). They continued to intentionally suppress and misrepresent the true facts regarding the toxic nature of the substances and their effect on the environment and people living there. (Id.).

The PCBs manufactured and improperly disposed of by defendants have an immediate and/or permanent adverse effect upon human health and the natural environment, and have specifically had an adverse affect upon the plaintiffs, their property, and the natural environment in which the property is located, (Id.).

**B.     Defendants Produced And Improperly Disposed Of PCBs**

Monsanto manufactured PCBs from the 1930s until the mid-1970s. (Compl. ¶ 26). The production of PCBs by Monsanto was "highly profitable." (Id.). The manufacture of PCBs was a dry process, meaning that it did not require the use of

water from public water systems, sewers, or natural sources of water.  (Compl. ¶ 27).

During the more than forty years that PCBs were produced at the Anniston plant, Monsanto routinely and intentionally, or otherwise recklessly, disposed of the PCBs and related toxic substances in a manner that endangered, and continues to endanger, human health and the environment.  (Compl. ¶ 28).  Specifically, Monsanto routinely dumped excess PCBs and acid containing PCBs into the plant's sewer system, which discharges directly into ditches around the plant.  (Compl. ¶ 29).  These ditches frequently flood, carrying PCBs and other toxins onto surrounding property.  (Id.).  Monsanto also routinely dumped PCBs and PCB-contaminated substances into crude landfills located on their property.  It failed to monitor or maintain those landfills, resulting in the migration of these substances. (Id.).

Defendants' improper and reckless disposal of PCBs caused them to be discharged into the atmosphere, soil, and waterways.  (Compl. ¶ 31).  This improper activity took place for many years without any corrective action being taken and has resulted in the contamination of the surrounding land and waters, even in areas many miles away.  (Id.).  As discussed below, this contamination of the environment continues today.  (Id.).

### C.    Defendants Knew Of The Hazards Of PCBs

Monsanto at all times relevant hereto knew of the hazards of PCBs but, because of the profitability of the enterprise, continued to manufacture, release, and improperly dispose of PCBs at the Anniston plant. (Compl. ¶ 32).  From the early days of PCB manufacturing, Monsanto recognized that PCBs were hazardous materials. (Compl. ¶ 33).  As early as the 1930s, Monsanto was aware that PCBs caused skin and liver disorders.  (Id.).  In the 1940s, scientists found that PCBs were linked to serious liver disorders in workers in wire and cable mills where PCBs were handled.  (Id.).  In the 1950s, reports showed that prolonged exposure to PCBs caused liver problems.  (Compl. ¶ 34).  In 1955, Monsanto recognized: "We know [PCBs] are toxic but the actual limit has not been precisely defined." (Id.).  In fact, Monsanto specifically prohibited their workers from eating lunches in the manufacturing areas of the chemical plant due to the dangers of PCBs.  (Id.). Thereafter, Monsanto, the U.S. government, and others conducted numerous tests related to PCBs that confirmed the toxicity and dangers of PCBs.  (Id.).

Monsanto learned in 1968 that 1300 people in Japan had become ill after eating PCB-contaminated rice oil.  (Compl. ¶ 35).  They learned in 1970 that cows in Ohio produced PCB-contaminated milk after ingesting grain from silos painted with paints that contained PCBs.  (Id.).  By that time, Monsanto had received

- 8 -

reports that PCBs in humans caused cancer, liver damage, and problems with the reproductive process.   (Id.).   In 1969, Monsanto concluded that "there is little probability that any action that can be taken will prevent the growing incrimination of specific [PCBs] as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds." (Compl. ¶ 36).   A 1974 report by the National Institute for Occupational Safety & Health sent to Monsanto stated that "a tremendous quantity of research has demonstrated that environmental exposure to [PCBs] causes serious impairment of the functions of the liver."   (Compl. ¶ 37).   A 1975 report by the United States Environmental Protection Agency sent to Monsanto confirmed that PCBs "pose a threat to human health and the environment."   (Compl. ¶ 38).

### D.   Defendants Knew That They Were Polluting The Land Surrounding The Anniston Plant

At all times relevant hereto, Monsanto knew that their method of handling and disposing of PCBs at the Anniston plant was uncontrolled and improper, and knew that this was causing pollution of the land around the plant and the waters below the plant.   (Compl. ¶ 40).   In internal memoranda, Monsanto officials acknowledge that "the waters in receiving streams below the Anniston plant contain significant (parts per million) concentrations of PCBs.   (Compl. ¶ 41).

More ominous perhaps is the fact that sediment in the bottom of these streams miles below our plants may contain up to 2% [PCBs]." (Id.).  Monsanto officials warned that "[t]he Dept. of Interior and/or State authorities could monitor plant outfall and find ppm of [PCBs] at Anniston anytime they choose to do so.  This would shut us down depending on what plants or animals they choose to find harmed." (Id.).

In a letter dated October 12, 1970, Monsanto, addressing the "(PCB) environmental pollution problem," wrote that they could "no longer dump scrap [PCBs] or spent transformer [PCBs] down the sewer.  Indiscriminate dumping of such material can lead to serious repercussions for the electrical industry." (Compl. ¶ 42).  In another memo, Monsanto acknowledged that it had become "increasingly obvious that high levels [of PCBs] would continue because of the PCBs trapped in the soil and in the sewer systems.  Clean-up of these sources can be economically impractical. . . .  It appears that the PCB contamination is so widespread that all of the plant's effluent must be treated.  This would result in a system more complex and costly than anyone had anticipated ... . ." (Compl. ¶ 43).

Despite their knowledge, Monsanto continued to manufacture PCBs and failed to warn plaintiffs of the dangers of PCBs that had polluted the area around the Anniston chemical plant.  (Compl. ¶ 44).   Further, Monsanto did not attempt

- 10 -

to clean up the environmental pollution they had caused and instead attempted to continue the production, release, and/or disposal of PCBs. (Id.).

E.   **Defendants Made Efforts To Conceal The Existence And Hazards Of PCBs**

With full knowledge of the hazards of PCBs and the pollution of the soil around the Anniston plant, Monsanto made the conscious decision to suppress and conceal these facts from the public and plaintiffs in order to maintain sales and to avoid liability, publicity, and other adverse consequences of their actions. (Compl. ¶ 45). Most egregiously, instead of attempting to warn the public and cleaning up the environment, Monsanto set out to sell even more PCBs. (Id.). At all times, Monsanto had knowledge superior to that of the State and the public concerning the true hazards of PCBs and the extent of the environmental pollution caused by Monsanto. (Id.).

In 1969, Monsanto appointed an "ad hoc" committee on PCBs to address the "situation concerning environmental contamination through the manufacture and use of [PCBs]." (Compl. ¶ 46). The purpose of the committee was to implement a plan to conceal material information from the public while at all times seeking to increase profits from the sales of PCBs. (Compl. ¶ 47). The stated objectives of the committee were to "[p]rotect continued sales and profits of [PCBs]" and

"[p]rotect the image" of Monsanto in order to "[p]ermit continued development of new uses and sales" of PCBs.  (Id.).

A memo setting out these objectives candidly acknowledged that "there is little probability that any action that can be taken will prevent the growing incrimination of specific [PCBs] as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds."  (Compl. ¶ 48).  In the face of known environmental hazards, the committee suggested "a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular [PCBs] as well as to protect the continued use of other members of the [PCB] series."  (Id.).  Monsanto was very concerned about their profits: "There can not be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds."   (Id.).   At a meeting at corporate headquarters in St. Louis on January 21 and 22, 1970, members of the Ad Hoc Committee and others discussed that animal "studies underway are not as favorable as we had hoped or anticipated" and decided that "some of the studies will be repeated to arrive at better results."  (Id.).

Monsanto established early on a company policy to "[g]ive no statements or publications which would bring the [PCB] situation to the public's attention." (Compl. ¶ 49). As part of their scheme to conceal, Monsanto set out to "cooperate" with government authorities in confidential discussions that were not disclosed to the public or to plaintiffs. (Compl. ¶ 50). Monsanto touted their (minimal) efforts to decrease the release of PCBs from the plant into the environment, but did not address their failure to do anything about the pollution that had already occurred as a result of years of improper disposal. (Id.). Monsanto, who had superior knowledge unknown to the authorities, failed to disclose to governmental authorities, including Alabama authorities, the extent of the pollution near Anniston and the long-term adverse effects of PCBs already discharged into the environment. (Id.). As a result, Alabama authorities did not comprehend the seriousness of the situation. (Id.). Monsanto concealed from the State and the public the levels of PCBs it found from regularly sampling fish in Choccolocco Creek and Lake Logan Martin during the latter half of the 1960s and the 1970s. (Id.). It concealed from the State and the public the results of periodic sediment testing during the same period. (Id.). It concealed from the State and the public what it knew about the hazards of PCBs. (Id.).

- 13 -

During this same time period, Monsanto filed reports with the State purporting to show the level of PCBs leaving the Anniston plant. (Compl. ¶ 51). The numbers in those reports intentionally misrepresented and understated the true numbers and failed to disclose the known existing contamination. (Id.). Monsanto decided to inform certain corporate customers of potential problems with PCBs while failing to disclose the long-term effects on the environment. (Id.). ("As the alarm concerning the contamination of the environment grows it is almost certain that a number of our customers or their products will be incriminated. The company could be considered derelict, morally if not legally, if it fails to notify all customers of the potential implication."). (Id.).

While deciding to confidentially inform certain customers of the potential dangers of PCBs, Monsanto made no effort to disclose to the public, including plaintiffs, the dangers of PCBs and the fact that the land around Anniston and the waters below had been contaminated with PCBs, which exist for years in the soil, sediment, and water. (Compl. ¶ 52).

Instead, Monsanto sought to conceal the extent of the problem from Alabama citizens. (Compl. ¶ 53). In November 1970, when contacted by the Anniston Star, Monsanto falsely represented that there was not "any cause for worry from the public health standpoint." (Id.). Monsanto falsely represented that

- 14 -

"no major quantities of PCBs leave the plant," and it wrongfully failed to disclose that even if the discharges ended immediately, dangerously high and unacceptable levels of PCBs would remain indefinitely in the waters and wildlife. (Id.). At the same time, Monsanto issued a press release claiming that losses of PCBs from manufacturing plants had been "negligible," even though the defendants' own documents showed that the losses over the last forty years had been substantial and that the then-current release was more than eighty-eight pounds of PCBs per day. (Id.). Further, Monsanto knew that the attempts to decrease the release of PCBs were unsuccessful; high levels of PCBs in the waters and sediment continued to be recorded by the defendants' own scientists. (Id.).

In 1975, a supposedly independent laboratory hired by Monsanto to study the effects of PCBs issued a report on cancer caused by PCBs in laboratory rats. (Compl. ¶ 54). The "independent" lab concluded in its report that PCBs were "slightly tumorigenic." (Id.). To conceal this information, Monsanto requested the lab to alter and falsify the report by changing the description of PCBs from "slightly tumorigenic" to "does not appear to be carcinogenic," in order to avoid adverse publicity. (Id.). That report and others similarly altered at about the same time were intended to conceal information from the public and persuade regulatory agencies, including those in Alabama, that PCBs were not harmful. (Id.). As

recently as April 1996, Monsanto ordered the adulteration of allegedly "independent" environmental reports describing conditions at the Anniston plant as "hazardous" and "contaminated." (Id.). These reports as altered were then given to the State of Alabama in an effort to conceal the true extent of the PCB problem from the State, and the public. (Id.). In February of 1994, Monsanto instructed its consultants to write a compliance plan that was "nominally compliant and implement it." (Id.). In September of 1994, Monsanto and its consultants decided to add a deep recovery system to its compliance plan, not to actually accomplish anything but to fraudulently conceal the extent of the contamination from the State and the public. (Id.). This fraudulent activity is noted in a "Telephone Conversation Record" dated September 12, 1995, which states: "Jo had a concern over why we were adding the deep recovery system. [Because] [i]t gives the appearance of doing something and maybe it will prevent them from asking you to delineate the contamination." (Id.).

The plan succeeded and through the early 1970's Monsanto continued to profit from the sale of PCBs while at all times failing to warn of the pollution of the area surrounding the Anniston plant. (Compl. ¶ 55). Only the threat of a national ban on production and the pressure of the United States government stopped Monsanto from continuing to manufacture PCBs in Anniston. (Id.). Even

- 16 -

after discontinuing the manufacture of PCBs at the Anniston plant, Monsanto continued to manufacture PCBs in Sauget, Illinois. (Id.). The ban on production in Anniston was too late however; the damage to the environment had already been done. (Id.). The defendants have repeatedly fraudulently concealed and covered up the existence and hazards of PCBs. (Id.).

**F.    Defendants' Continued Pollution Of The Waters And Land, And The Lasting Effects Of PCBs**

PCBs discharged into the environment over a period of forty years by the defendants polluted the land in the area of the Anniston plant and the waterways below the Anniston plant. (Compl. ¶ 56). Because of their longevity, PCBs continue to exist in the environment. (Id.).

The situation is worsened by the defendants' continuing failure to acknowledge the problem. (Compl. ¶ 57). The defendants failed to and continue to fail to properly monitor and clean up their property, which has resulted in the discharge of more PCB pollutants into the area surrounding the Anniston plant as a result of run-off, leaking landfills, and dust from the defendants' construction and demolition activities. (Id.).

High levels of PCBs have been found around the plant. (Compl. ¶ 58). PCBs were found in the summer of 1998 in storm water samples taken from ditches leading from the plant. (Id.). The land all along these ditches is also

- 17 -

heavily contaminated with PCBs. (Id.). In one area along the ditch, consultants found more than 200,000 ppm (parts per million) of PCBs in the soil. (Id.). Under federal guidelines, any substance containing 50 ppm or more of PCBs has to be disposed in a special hazardous waste landfill such as the Emelle facility in Sumter County. (Id.). A draft consultation report prepared by the Alabama Department of Public Health states that the land around the plant and adjacent to the plaintiffs' property should be deemed a public health hazard. (Id.). Fish advisories have been posted fifty miles downstream. (Id.).

Despite the acknowledged existence of PCBs in the area surrounding the Anniston plant, the defendants have refused to remove the PCBs from their landfills and to properly clean up contaminated soil. (Compl. ¶ 59). Indeed, until lawsuits were brought against them, the defendants essentially made no meaningful effort to clean up or alleviate the environmental hazard they had created or to otherwise warn the public. (Id.). This was true even after production of PCBs ceased in the 1970s, and even after the national ban on production by the U.S. government. (Id.). Instead, the defendants attempted to close their eyes to the problem. (Id.).

### G.    The "Buy Out"

Once the defendants were "caught" and lawsuits were filed in the 1990s, they began to take action.  (Compl. ¶ 60).  Rather than acknowledge the problem, the defendants waged a vigorous defense to all claims of PCB contamination and denied any wrongdoing.  (Id.).  Most egregiously, the defendants still delay and refuse to clean up the environmental pollution they caused.  (Id.).

To aid in their defense, the defendants initiated a "buy out" plan whereby the defendants purchased some residential property around the Anniston plant, which is undisputedly contaminated with PCBs.  (Compl. ¶ 61).  The defendants went door-to-door attempting to convince residents of the low-income neighborhood to sell their property at inflated rates and to move away, thereby decreasing the number of possible plaintiffs and witnesses and concealing the evidence of the extent of pollution of the area with PCBs.  (Id.).  The direct result of this "buy out" program was the destruction of the community and immediate neighborhood and further harm to the surrounding neighborhoods.  (Id.).  The increased dust, storm water runoff, and mud created by the defendants' demolition of the properties they purchased continue to contaminate the area surrounding the Anniston plant.  (Id.).  PCB levels in dust sampled in the area, including dust from inside some homes, are extremely high.  (Id.).

**H.**     **Plaintiffs' Health And Property Have Been Detrimentally Impacted By Defendants' Tortious And Wrongful Actions**

Plaintiffs have suffered personal injuries and property damage as a result of the defendants' tortious and wrongful acts. (Compl. ¶ 62). Each plaintiff with PCBs in his or her body has suffered present personal injury in the form of cellular, subcellular, changed bodily functions, and other personal injuries. (Id.). Each plaintiff whose mother was exposed to PCBs while pregnant has suffered personal injuries in the form of neurological deficits. (Id.). Other plaintiffs have suffered other personal injuries and illnesses. (Id.). Additionally, plaintiffs have suffered loss of enjoyment of life and use of their property and residences. (Id.). Among other things, plaintiffs here have been warned not to eat the local fish; not to eat the local clay (a local custom); and not to allow their children to play in the local ditches, waterways or even on the contaminated ground of their own homes. (Id.). They have been told by the United States Government not to eat or drink while working in their gardens because PCB-contaminated soil and dust could get on the food or drink. (Id.). They have been told not to work in their garden on windy days because PCB-contaminated dust "can be stirred up and get in your nose or mouth"; to be "sure to wash your hands and work clothes to remove dust and dirt after gardening"; and to "take off your shoes at the door to avoid tracking soil into your home." (Id.). The Government further warns that garden-grown vegetables should be soaked overnight in water; thoroughly washed with vinegar, and

scrubbed before eating.  (Id.).  To "help reduce [the] potential for exposure," plaintiffs have been instructed to eat a mix of vegetables from both their own garden and the market.  (Id.).  The actions of the defendants have damaged, in these and many other ways, the use and enjoyment of the plaintiffs' property, and enjoyment of life.  (Id.).

## III.

## ARGUMENT

The typical brief urging class certification outlines Rule 23, cites cases describing the standard for certification, and then addresses the prerequisites, in the order set forth in the rule, of Rule 23(a) and then the applicable provisions of Rule 23(b).  In view of this Court's familiarity with this particular case and its well-known expertise in class actions, we will eschew the normal order and go directly to the heart of the matter: whether this class satisfies the requirement under Rule 23(b)(3) that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."   Fed. R. Civ. P. 23(b)(3).   We will then address the numerosity, commonality, typicality, and adequacy of representation requirements, easily satisfied here, of Rule 23(a).

**A.     Plaintiffs Have Satisfied The Predominance And Superiority Requirements Of Rule 23(b)(3)**

In determining whether an action satisfies Rule 23(b)(3)'s requirement that questions of law or fact common to members of the class predominate over any questions affecting only individual members such that a class action is superior to other available methods for the fair and efficient adjudication of the controversy, the district court examines the following factors:

> (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

**1.     Common Questions Of Law And Fact Predominate.**

As the Eleventh Circuit declared, "[u]nder Rule 23(b)(3), 'it is not necessary that all questions of fact or law be common, but only that *some* questions are common and that they predominate over individual questions.'" Klay v. Humana, Inc., 382 F.3d 1241, 1254 (11th Cir. 2004) (emphasis supplied) (citing In re Theragenics Corp. Secs. Litig., 205 F.R.D. 687, 697 (N.D. Ga. 2002)).  "The common questions need not be dispositive of the entire action. In other words, 'predominate' should not be automatically equated with 'determinative' or 'significant.' Therefore, when one or more of the central issues in the action are

- 22 -

common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." 7A Charles A. Wright et al., <u>Federal Practice and Procedure 3d.</u> § 1778 (1986).

This case simply cries out for class treatment under Rule 23(b)(3). The common questions of law and fact – i.e., factual questions of the quantum, quality, disposal, and dispersion pattern of PCBs from defendants' West Anniston plant; whether defendants' properly monitored and cleaned up their property and landfills to prevent the further discharge of PCBs into the surrounding neighborhoods; whether the defendants concealed from the public, including plaintiffs, the dangers and existence of PCBs in the soil and waters in the neighborhoods adjacent to the plant; and the myriad legal questions of defendant's liability therefore – completely predominate in this litigation. The common questions of law and fact dwarf the *only* individual issue presented: how much damage did each plaintiff suffer. Such questions of damages simply do not negate class action certification. "[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." <u>Klay</u>, 382 F.3d at 1259 (citing <u>Allapattah Servs. v. Exxon Corp.</u>, 333 F.3d 1248, 1261 (11th Cir. 2003)).

Courts routinely find common questions of law and fact to predominate in a wide-range of toxic tort cases where damages are deemed individual. For example, in <u>Sterling v. Velsicol Chemical Co.</u>, 855 F.2d 1188 (6th Cir. 1988), a class action was brought against a chemical corporation for personal injuries and property damage resulting to residents who lived near the corporation's chemical waste burial site. The claims alleged stemmed from personal injuries and property damage resulting from hazardous chemicals leaking from the landfill and contaminating the local water supply. The district court certified a 23(b)(3) class and held the corporation liable upon legal theories of strict liability, common law negligence, trespass, and nuisance; the Sixth Circuit upheld the lower court. The court found that common questions of law and fact predominated:

> Almost identical evidence would be required to establish the level and duration of chemical contamination, the causal connection, if any, between the plaintiffs' consumption of the contaminated water and the type of injuries allegedly suffered, and the defendant's liability. . . . In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

<u>Sterling</u> at 1197.

Similarly, in <u>Olden v. LaFarge Corp.</u>, 383 F.3d 495 (6th Cir. 2004), the court affirmed class certification in a lawsuit brought by homeowners against the owner of a cement manufacturing plant, alleging personal and property damage caused by toxic pollutants originating from the plant.   In so holding, the Sixth Circuit reasoned:

> Whether the defendant's negligence caused *some* increased health risk and even whether it tended to cause the class minor medical issues can likely be determined for the whole class. . . . Whether the defendant's negligence generally caused minor property damage and cement dust can likely be determined for the entire class as well.

<u>Id</u>. at 508-09.  Again, in <u>In re School Asbestos Litig.</u>, 789 F.2d 996 (3rd Cir. 1986), in affirming Rule 23(b)(3) class certification in a lawsuit brought by school districts seeking compensatory and punitive damages, as well as injunctive relief, stemming from compliance with the Asbestos School Hazard Detection and Control Act, the Third Circuit noted:

> Commonality existed in an underlying core of issues identified as: '(a) The general health hazards of asbestos; (b) defendants' knowledge or reason to know of the health hazards of asbestos; (c) defendants' failure to warn/test; and (d) defendant's concert of action and/or conspiracy involving formation of and adherence to industry practices.'  Those elements could 'be established by common proof, which, although it may be complex, does not vary from class-member school to class-member school.'

<u>Id</u>. at 1000 (citing <u>In re Asbestos School Litig.</u>, 104 F.R.D. 422, 429 (E.D.Pa. 1984).  Substitute "PCBs" for "asbestos" in the above quote and the Third Circuit's

reasoning fits this case perfectly.  The court certified this class even though it involved the substantive tort law of many jurisdictions, <u>In re School Asbestos Litig.</u>, 789 F.2d at 1000, *unlike this case*.

Another illustrative case is <u>Cook v. Rockwell Int'l Corp.</u>, 151 F.R.D. 378 (D. Colo. 1993), where the district court certified a class where owners of property near a federal weapons production facility brought suit against the facility operators for damages sustained to the environment and their health allegedly caused by the release of radioactive and nonradioactive substances.  The plaintiffs sought damages for property and other economic harm, mental and emotional distress, and medical monitoring, plus exemplary damages.  The court found that:

> [P]laintiffs have demonstrated that this case presents many common issues of law and fact, including whether the operation of Rocky Flats constitutes an ultrahazardous activity; whether defendants exercised reasonable care to prevent the release of hazardous radioactive and nonradioactive materials from Rocky Flats; what materials were released, in what quantities; what caused the releases; what precautions to avoid emissions were taken; whether the geographic dispersion of the releases in the surrounding environment was reasonably foreseeable; and whether defendants engaged in intentional, reckless, willful, or wanton conduct. These common issues represent the core of plaintiffs' action against defendants and to the extent that the claim of each plaintiff depends upon proof concerning these common issues, it would serve no purpose to force multiple trials to hear the same evidence and decide the same issues . . . [w]ere plaintiffs to bring separate actions, these questions would necessarily be relitigated over and over, and the same evidence would be presented in each case.

151 F.R.D. at 388-89 (citations omitted).  Again, the factual issues are identical –
just substitute "PCBs" for "hazardous radioactive and nonradioactive materials."
There are yet more analogous cases.  In Re Copley Pharmaceutical, Inc., 158
F.R.D. 485, 489 (D.C.Wyo. 1994) (certifying a class in a tort case and in so doing,
finding common questions to predominate, including whether defendant's
manufacturing process was defective, whether defendant was negligent in its
manufacture and distribution of the drug, and whether the chemicals involved were
dangerous to the human body); Yslava v. Hughes Aircraft Co., 845 F.Supp. 705
(D.Ariz. 1993) (finding certification under Rule 23(b)(3) appropriate where
plaintiffs alleged that an aircraft company caused contamination of the
groundwater in the area of the airport, resulting in personal injury or death, after
determining questions of whether the defendant was the source of contamination
predominated over questions applying to the class members individually); Oullette
v. Int'l Paper Co., 86 F.R.D. 476 (D.Vermont 1980) (certifying a class in a suit
brought against an operator of a paper mill claiming the dumping of waste into the
lake constituted a nuisance that diminished the value and interfered with the
enjoyment of their property and in so doing, finding common issues to
predominate, including defendant's discharge of papermaking waste into lake and
its liability for diminished property value and enjoyment of use caused thereby).[2]

---

2       Defendants, of course, cannot advance the usual defense argument in mass tort cases that
the need to apply varying states' laws precludes class treatment, since under the well-settled

The similarity of the legal and factual issues that were held in the foregoing cases to predominate over the individual damages issues are eerily similar to the issues presented by the defendants' PCB pollution in this case:  the discharge of the hazard, the dispersion of the hazard, the defendants' knowledge and culpability, etc.  These authorities unequivocally support this Court's discretion to find in this case that common issues of law and fact predominate over individual ones.

### 2.    A Class Action Is Superior To Any Other Method Of Adjudication Of This Matter.

Courts in toxic tort cases have determined that class certification is superior to other available methods for the fair and efficient adjudication of the controversy. The Sixth Circuit, in affirming class certification in Sterling v. Velsicol Chemical Co., 855 F.2d 1188 (6th Cir. 1988), stated, "The procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense."  855 F.2d at 1196.  In certifying the class, the court "avoided duplication of judicial effort and prevented separate actions from reaching inconsistent results with similar, if not identical, facts." Id. at 1197.  The Third Circuit, in In re School Asbestos Litig., 789 F.2d 996, 1001 (3rd Cir. 1986), indicated that "[i]nefficiency results primarily from relitigation of the same basic

---

Alabama rule of lex loci delicti, the law of one state – Alabama – applies to the claims of all plaintiffs and class members. Fitts v. Minn. Min. & Mfg. Co., 581 So.2d 819, 820 (Ala. 1991).

issues in case after case."  The court noted that "[i]n case after case, the health

issues, the question of injury causation, and the knowledge of the defendants are

explored, often by the same witness." Id. at 1010.  "If economies can be achieved

by use of the class device, then its application must be given serious and

sympathetic consideration." Id. at 1008-09.

In Mejdrech v. Met-Coil Systems Corp., 319 F.3d 910 (7th Cir. 2003), a

case where area residents sued a factory owner for monetary and injunctive relief

under state and federal environmental laws, alleging a leaking storage tank on the

factory owner's property contaminated soil and groundwater beneath their homes,

the Seventh Circuit affirmed class certification, and stated:

> If there are genuinely common issues, issues identical across all
> the claimants, issues moreover the accuracy of the resolution of which
> is unlikely to be enhanced by repeated proceedings, then it makes good
> sense, especially when the class is large, to resolve those issues in one
> fell swoop while leaving the remaining, claimant-specific issues to
> individual follow-on proceedings.  The questions whether Met-Coil
> leaked TCE in violation of law and whether the TCE reached the soil
> and groundwater beneath the homes of the class members are common
> to all the class members.

Mejdrech, 319 F.3d at 911 (citations omitted).  The court further found that class

certification worked in that case particularly well because "[a]ll the class members

are residents of the same state and are proceeding under the same federal and state

laws." Id. at 912.  Like in Mejdrech, the case before this Court is also "not a case

in which, because class members are scattered around the country and proceeding

under the laws of different states, determination of class-wide issues would require the judge to create a composite legal standard that is the positive law of no jurisdiction." Id.

Class certification makes sense here. A large number of plaintiffs have been injured by the wrongful and tortious acts of the defendants. The standard case-by-case process for adjudicating mass tort claims generally denies efficiencies to plaintiffs, but automatically affords those litigation advantages to defendants, who are repeat litigators of the same issues. See generally David Rosenberg, Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't, 37 Harv. J. Legis. 393, 404 (2000) ("Systemic bias . . . poses a major obstacle by preventing plaintiffs from investing optimally in developing the aggregate value of their claims, while the defendant engages in precisely that investment strategy to strengthen its case on the common questions and further drive down its adversary's expected benefit . . . . [T]he systemic bias favoring the defendant subverts the goal of fully internalizing the costs of tortious harm."); Marc Galanter, Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change, 9 L. & Soc'y Rev. 95 (1974) (analyzing the repeat player issue). The aggregation of claims in a multiple action as in this case restores balance in litigation power to ensure one of the primary goals of tort law: effective and administratively efficient deterrence and compensation. See David Rosenberg, Individual Justice and Collectivizing Risk-

<u>Based Claims In Mass Exposure Cases</u>, 71 N.Y.U. L. Rev. 210 (1996) (calling for consideration of collectivization in mass exposure cases from the perspective of the deterrence and compensation policies underlying tort law).

Each class member has very little, if any, interest in individually controlling the prosecution of separate actions, most notably because of the greater strength the plaintiffs will have as a class vis-à-vis the "behemoth" that is the defendants than as individual plaintiffs.  <u>See</u> <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241, 1270 (11th Cir. 2004) (indicating the import of class actions when "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.") (citation omitted).  It is desirable for all parties to concentrate this litigation in one forum to achieve the maximum economy for the Court and the parties.

Although the Eleventh Circuit has recently stated that manageability concerns "will rarely, if ever, be in [themselves] sufficient to prevent certification of a class," <u>Klay</u>, 382 F.3d at 1272-73 (citation omitted), plaintiffs nevertheless do not anticipate any particular difficulties in managing this case as a class action. Questions of fact and law are common to the class and will all be evaluated under the laws of Alabama; if the Court deems it necessary, individual determinations of damages can be done separately.  Federal Rule of Civil Procedure 23(c)(4)(A) permits courts to grant class certification for particular issues, which the courts

may do *sua sponte*. <u>United States Parole Comm'n v. Geraghty</u>, 445 U.S. 388

(1980). Specifically, Rule 23(c)(4)(A) states, "When appropriate (a) an action may

be brought or maintained as a class action with respect to particular issues, or (b) a

class may be divided into subclasses and each subclass treated as a class, and the

provisions of this rule shall then be construed and applied accordingly." Fed. R.

Civ. P. 23(c)(4)(A).   Thus, the Court may opt to proceed with the common

questions of law and fact in the class action form, and then divide the classes into

sub-classes (predicated on types of injury, i.e. personal and personal with property

damage), or even further sub-classes (predicated on PCB levels, proximity to the

Anniston plant, or any other such determination).

Conversely, the Court could permit the plaintiffs to proceed as a class as to

all common issues of fact and law and then, if successful, the plaintiffs would be

permitted to pursue their individual cases in separate trials to determine if they

suffered an injury and if so, the proper measure of any damages.  This would mean

that claims for compensatory and punitive damages would be tried separately. <u>See,

e.g.</u>, <u>Watson v. Shell Oil Co.</u>, 979 F.2d 1014 (5th Cir. 1992) (affirming class

certification and phased trial plan in mass tort litigation arising out of an explosion

at an oil refinery, where the claims involved negligence, strict liability, and

intentional tort, and punitive damages were sought).

As this Court is well aware, these and other authorities provide the Court with vast discretion to manage a class action in a way that achieves maximum efficiency and justice for all parties. A class action is a clearly superior method for adjudicating this dispute. For these reasons, and because the requirements of Rule 23(a) are easily satisfied (as set forth below), plaintiffs submit that their motion for class certification is due to be granted.

**B.     Plaintiffs Have Satisfied Each Of The Four Factors Contained In Rule 23(a)**

Plaintiffs have exceeded the requirements set forth in Federal Rule of Civil Procedure 23(a), which are typically referred to in shorthand as numerosity, commonality, typicality, and adequacy of representation.

**1.     The Class Is So Numerous That Joinder Of All Members Is Impracticable.**

The standard for whether numerosity is satisfied is not high. The test under Rule 23(a)(1) is simply whether there are so many potential class members that joinder is impracticable. "'Impracticable' does not mean 'impossible'; plaintiffs need only show that it would be extremely difficult or inconvenient to join all members of the class." In re HealthSouth Corp. Sec. Litig., 213 F.R.D. 447, 457 (N.D.Ala. 2003) (citations omitted). The Eleventh Circuit has held that "while there is no fixed numerosity rule, generally less than twenty-one is inadequate,

more than forty adequate, with numbers varying according to other factors." <u>Cox v. Am. Cast Iron Pipe Co.</u>, 784 F.2d 1546, 1553 (11th Cir. 1986) (citation omitted).

The potential class in this case numbers in the thousands. As detailed in their respective affidavits, Messrs. Davis and Roden, through personal knowledge and information, both individually and upon inquiry of other attorneys, are aware of thousands of people who sustained personal injury and/or property damage due to defendants' wrongful and tortious manufacture and disposal of PCBs from their West Anniston, Alabama plant, and were not part of any previous settlement. (Evid. Mat. Tab 1, Davis Aff. & Evid. Mat. Tab 2, Roden Aff.). Obviously, the proposed class easily satisfies the numerosity requirement. <u>See</u> <u>In re HealthSouth Corp. Sec. Litig.</u>, 213 F.R.D. at 457; <u>Cox</u>, 784 F.2d at 1553.

### 2.    There Are Questions of Law Or Fact Common To The Class.

"Rule 23(a) does not require that all the questions raised by the dispute be common." <u>Cox v. Am. Cast Iron Pipe Co.</u>, 784 F.2d 1546, 1557 (11th Cir. 1986). "Rather, as Rule 23(a) explicitly states, a court need only find a *single* common issue of law or fact to satisfy the commonality requirement." <u>Kreuzfeld A.G. v. Carnehammar</u>, 138 F.R.D. 594, 599 (S.D.Fla.1991); <u>see</u> <u>In re Healthsouth Corp. Sec. Lit.</u>, 213 F.R.D. 447, 457 (N.D.Ala. 2003) ("This minimal standard merely requires an identity of some factual or legal matter among members of the class.") (citing <u>Hudson v. Delta Air Lines, Inc.</u>, 90 F.3d 451, 456 (11th Cir.1996)); <u>see also</u>

1 Alba Conte & Herbert B. Newberg, <u>Newberg on Class Actions</u> § 3.10 (4th ed. 2005). The permissibility of a class action is *not* defeated if separate issues of law and fact exist, particularly regarding damages. <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241, 1259 (11th Cir. 2004) ("numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.").

We have detailed above the numerous critical common questions of law and fact that exist and, indeed, predominate, in this case, and easily satisfy Rule 23(a)(2)'s requirement of commonality.

### 3. The Claims And Defenses Of The Representative Plaintiff Are Typical Of The Claims And Defenses Of The Class.

Typicality, as this requirement is commonly known, primarily directs the district court to focus on whether named representatives' claims have "the same essential characteristics as the claims of the class at large." <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 714 (11th Cir. 2004) (citation omitted). "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." <u>Kornberg v. Carnival Cruise Lines, Inc.</u>, 741 F.2d 1332, 1337 (11th Cir. 1984). Thus, "to be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." <u>Senter v. Gen. Motors Corp.</u>, 532 F.2d 511, 525, n.31 (6th Cir.); <u>see also</u> 7A Charles A. Wright et

al, Federal Practice and Procedure 3d. § 1764 (1986) ("the requirement may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class.").

In this case, there is no doubt that plaintiffs' claims are typical of the proposed class – Ms. Clopton and Mr. Stinson both suffered personal injury and/or property damage due to defendants' tortious and wrongful conduct regarding the manufacture and disposal of PCBs from their Anniston plant. The proposed class also suffered personal injury and/or property damage due to defendants' tortious and wrongful conduct regarding the manufacture and disposal of PCBs from their Anniston plant. Therefore, the typicality requirement is satisfied in this case.

### 4. The Representative Plaintiffs Will Fairly And Adequately Protect The Interest Of The Class.

The final requirement of Rule 23(a) is that the representative plaintiffs will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The courts typically look at two criteria for determining the adequacy of representation: (a) the named representatives must have common interests with unnamed members of the class; and (b) it must appear that the named representatives will vigorously prosecute the case and protect the interests of the class through qualified counsel. Drayton v. Western Auto Supply Co., 2002 WL

32508918 at *5 (11th Cir. 2002) (attached, Exhibit A) (citing <u>Gonzales v. Cassidy</u>, 474 F.2d 67, 72 (5th Cir. 1973)).

In this case, it is certainly true that plaintiffs Sarah Clopton and S.T. Stinson both have common interests with the unnamed members of the class, because, like the class, each has suffered personal injury and, in some cases, property damage, due to the egregious and harmful practices of the defendants with regard to PCBs. (Evid. Mat. Tab 3, Clopton Aff. & Evid. Mat. Tab 4, Stinson Aff.).  The named plaintiffs and the class members likewise share an interest in being compensated for the injuries they have each sustained because of the aforementioned practices of the defendants.  (<u>Id</u>.).  Also, plaintiffs and the class members share an interest in obtaining injunctive relief to prevent further deterioration of their health and physical environment due to defendants' tortious and wrongful disposal of PCBs from their Anniston plant.  (<u>Id</u>.).

With regard to the requirement that the named representatives vigorously prosecute the case and protect the interests of the class through qualified counsel, Ms. Clopton and Mr. Stinson intend to do just that.  Ms. Clopton and Mr. Stinson are both pleased with the legal representation that has been provided in this case. (<u>Id</u>.).  The attorneys have kept each client informed of the progress of the case, and Ms. Clopton and Mr. Stinson both believe their attorneys will fairly and competently represent the interests of the class.  (<u>Id</u>.).  Ms. Clopton and Mr.

Stinson are both interested in these proceedings. (Id.). Each is familiar with the conduct and practices challenged in this litigation because each has suffered injury and damage from the defendants' tortious and wrongful actions. (Id.).

Although "adequate class representation generally does not require that the named plaintiffs demonstrate to any particular degree that individually they will pursue with vigor the legal claims of the class," Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 727 (11th Cir. 1987), Ms. Clopton and Mr. Stinson intend to vigorously pursue their claims and the claims of the class members against defendants. (Evid. Mat. Tab 3, Clopton Aff. & Evid. Mat. Tab 4, Stinson Aff.). Each hopes this lawsuit will finally put an end to the egregious and harmful practices of the defendants with regard to PCBs. (Id.). Neither Ms. Clopton nor Mr. Stinson wants these defendants to continue to harm the people and property near the Anniston plant. (Id.). Ms. Clopton and Mr. Stinson are willing and will be pleased to act as the class representative in this matter. (Id.). Each named plaintiffs' interest in this litigation is consistent with the interest of the proposed nationwide class. (Id.). There has been no collusion between Ms. Clopton and Mr. Stinson and other members of the proposed class. (Id.)

Therefore, Ms. Clopton and Mr. Stinson are adequate members representatives of the class. Nevertheless, because of the thousands of members of the proposed class, plaintiffs propose upon certification to add at least three

additional class representatives in order to reflect the broad diversity of the plaintiff class.

While adequacy of counsel is presumed, see, e.g., Siegel v. Realty Equities Corp. of N.Y., 54 F.R.D. 420 (S.D.N.Y. 1972); 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 7.24 (4th ed. 2005), no such presumption is necessary in this case. Plaintiffs' lead counsel, D. Frank Davis, of the Birmingham, Alabama law firm Davis & Norris LLP, and Robert Roden, of the Birmingham, Alabama law firm Shelby Roden LLC, are experienced class action lawyers with the background and expertise to competently and vigorously pursue the claims of the plaintiff class. (Evid. Mat. Tab 1, Davis Aff. & Evid. Mat. Tab 2, Roden Aff.). Mr. Davis has devoted a significant portion of his thirty-year legal career to mass tort and class action litigation. (Evid. Mat. Tab 1, Davis Aff.). Mr. Davis has represented both plaintiffs and defendants in class actions in many different states throughout the country. (Id.). He has both settled class actions and tried class actions. (Id.). Mr. Davis is a member of the Alabama and Tennessee bars. (Id.). He is currently admitted to practice in the United States Supreme Court, the Fifth and Eleventh Circuit Courts of Appeals, and each federal district court in Alabama. (Id.). Mr. Davis has been admitted, at one time or another, on a *pro hac vice* basis in federal or state courts in a majority of the states in the country. (Id.).

As detailed in Mr. Davis's affidavit (id.), Mr. Davis has been lead or co-lead counsel in many class action and mass tort cases. (Id.). He has successfully defended class actions and has obtained numerous multi-million dollar settlements on behalf of plaintiff classes. (Id.). Among other things, Mr. Davis was one of the counsel for the plaintiffs in Tolbert v. Monsanto Co., et al., which settled for $300 million on behalf of 18,000 claimants who were poisoned by PCB contamination in Anniston, Alabama. (Id.). Mr. Davis is qualified, experienced, and well able to conduct this litigation. (Id.). He will vigorously and competently pursue this litigation. (Id.).

The other lead counsel for plaintiffs, Robert Roden, has handled several class actions and mass tort cases as well as extremely technical products liability actions over the last thirty years. (Evid. Mat. Tab 2, Roden Aff.). Mr. Roden is a member of the Alabama bar and is admitted to practice in the Eleventh Circuit Court of Appeals and each federal district court in Alabama. (Id.). In addition to the courts listed above, Mr. Roden has been admitted to practice on a *pro hac vice* basis in federal and state courts in many jurisdictions throughout the country. (Id.).

As detailed in Mr. Roden's affidavit (id.), Mr. Roden has participated in the prosecution of numerous class action and mass tort cases on behalf of injured plaintiffs as both lead and co-lead counsel. (Id.). Among them include numerous multi-million dollar settlements against Conoco Phillips in Lake Charles,

Louisiana and the <u>Tolbert v. Monsanto</u> lawsuit, in which he was also one of the counsel for the plaintiffs. (<u>Id.</u>). Mr. Roden currently serves on the Plaintiff's Coordinating Committee in the Multi-District Litigation involving Ephedra Products pending before Judge Rakoff in the United States District Court for the Southern District of New York. (<u>Id.</u>). More recently, Mr. Roden worked with the U.S. Department of Justice in a settlement against Healthsouth for Medicaid fraud which brought an approximately $325 million settlement. (<u>Id.</u>). Mr. Roden is also currently involved in the Agent Orange Products Liability Litigation on behalf of the Vietnam Citizens who were exposed to Agent Orange during the Vietnam War. (<u>Id.</u>). Mr. Roden is qualified, experienced, and well able to conduct this litigation. (<u>Id.</u>). He also will vigorously and competently pursue this litigation. (<u>Id.</u>).

Based upon the foregoing, the requirement of adequacy of representation is satisfied.

## IV.

## CONCLUSION

Because plaintiffs have satisfied each of the requirements of Rules 23(a) and 23(b)(3), the Court should exercise its discretion to grant plaintiffs' motion for class certification. Plaintiffs also pray for such other, further, or different relief to which they may show themselves entitled.

/s/  Frank Davis
D. Frank Davis (DAV009)
One of the Attorneys for Plaintiffs

**OF COUNSEL:**

D. Frank Davis, Esq.
John E. Norris, Esq.
G. Renée Dall, Esq.
DAVIS & NORRIS
One Highland Place
2151 Highland Avenue, Suite 100
Birmingham, AL 35205
Telephone:  (205) 930-9900
Facsimile:  (205) 930-9989

Annesley H. DeGaris, Esq.
CORY, WATSON, CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 35205
Telephone:  (205) 328-2200
Facsimile:  (205) 324-7896

Josh Wright, Esq.
HOLLIS & WRIGHT, P.C.
Suite 1750 Financial Center
505 North 20th Street
Birmingham, AL 35203
Telephone: (205) 324-3600
Facsimile: (205) 324-3636

Earl P. Underwood, Jr., Esq.
LAW OFFICES OF EARL P. UNDERWOOD, JR.
Post Office Box 969
Fairhope, AL 36533
Telephone:  (251) 990-5558
Facsimile:  (251) 990-0626

Robert B. Roden, Esq.
SHELBY & RODEN

2956 Rhodes Circle
Birmingham, AL 35205
Telephone: (205) 933-8383
Facsimile: (205) 933-2299

## CERTIFICATE OF SERVICE

I do hereby certify that on this the 20th day of June 2005, I served a copy of the foregoing, by placing the same in the U. S. Mail, first-class postage affixed, addressed to the following:

William S. Cox, III, Esq.
Kevin E. Clark, Esq.
Lightfoot, Franklin & White, L.L.P.
The Clark Building
400 20th Street North
Birmingham, Alabama 35203

J. Mark White, Esq.
Julia S. Stewart, Esq.
White, Arnold, Andrews & Dowd
2025 3rd Avenue North, Suite 600
Birmingham, Alabama 35203

William J. Baxley, Esq.
Joel E. Dillard, Esq.
Baxley, Dillard, Dauphin & McKnight
2008 3rd Avenue South
Birmingham, Alabama 35233

/s/  Frank Davis
OF COUNSEL

**Westlaw.**

Not Reported in F.3d                FOR EDUCATIONAL USE ONLY                                      Page 1

2002 WL 32508918 (11th Cir.(Fla.))

**(Cite as: 2002 WL 32508918 (11th Cir.(Fla.)))**

**H**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals, Eleventh Circuit.
Bridget DRAYTON, Wanda Gibbs Mitchell, et al.,
Plaintiffs-Appellees,
v.
WESTERN AUTO SUPPLY COMPANY,
Advance Stores Company, Inc., Defendants-
Appellants.
**No. 01-10415.**

March 11, 2002.

Appeal from the United States District Court for
the Middle District of Florida.

Wilfried H. Florin, Florin, Roebig & Walker, P.A.,
Palm Harbor, FL, J. Hoke Peacock, III, Joseph S.
Grinstein, Susman Godfrey, LLP, Houston, TX, for
Plaintiffs-Appellees.

Sylvia H. Walbolt, Carlton, Fields, Ward,
Emmanuel, et al., Saint Petersburg, FL, James R.
Wiley, Carlton Fields, P.A., Lakeland, FL, Joan B.
Tucker Fife, Winston & Strawn, Washington, DC,
Cathleen G. Bell, Carlton, Fields, Ward, Emmanuel,
et al, Tampa, FL, Gerald C. Peterson, C.R.
Gangemi, Jr., Winston & Strawn, Chicago, IL, for
Defendants-Appellants.

Before BLACK, HILL and STAPLETON, [FN*]
Circuit Judges.

> FN* Honorable Walter K. Stapleton, U.S.
> Circuit Judge for the Third Circuit, sitting
> by designation.

PER CURIAM.

*1 Appellants Western Auto Supply Company
(Western) and its successor, Advance Stores
Company, Inc. (Advance), appeal the district court's
grant of class certification to Appellees Bridget
Drayton, Wanda Gibbs Mitchell, and Anthony Rich,
the named plaintiffs and class representatives.
Appellees brought suit claiming race discrimination
in violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. §§ 2000e--2000e-17 (1994), and
42 U.S.C. § 1981 (1994). Upon Appellees' motion,
the district court certified a class under Federal
Rules of Civil Procedure 23(b)(2) and (b)(3),
consisting of: "All African-American individuals
who are employed or, have been employed in
Western Auto's retail division, or who have applied
for positions within that division, since July 7,
1994." Appellants filed this interlocutory appeal
contesting class certification. See Fed.R.Civ.P. 23(f).
[FN1]

> FN1. Rule 23(f) provides: "A court of
> appeals may in its discretion permit an
> appeal from an order of a district court
> granting or ' denying class action
> certification under this rule if application is
> made to it within ten days after entry of the
> order. An appeal does not stay proceedings
> in the district court unless the district judge
> or the court of appeals so orders."

On appeal, Appellants raise three arguments: (1)
Appellees lack standing to raise the class claims or
seek injunctive relief; (2) Appellees are inadequate
class representatives; and (3) the district court failed
to perform the appropriate analysis in determining
class certification. We affirm the district court's
grant of class certification under Rule 23(b)(3) to
the extent (1) Appellees abandon their individual
claims seeking compensatory and punitive damages,
and (2) the class is defined to exclude job
applicants. We reverse the district court's grant of
class certification under Rule 23(b)(2).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



PLAINTIFF'S
EXHIBIT
A

Not Reported in F.3d                FOR EDUCATIONAL USE ONLY                                    Page 2

2002 WL 32508918 (11th Cir.(Fla.))

**(Cite as: 2002 WL 32508918 (11th Cir.(Fla.)))**

### I. BACKGROUND

Appellees were all African-American employees of Western when it announced it was converting its stores to Parts America stores which would no longer perform automotive services, only sell automotive parts and accessories. The conversion resulted in the elimination of certain positions. The eliminated positions included those of Appellees. [FN2] Thereafter, Advance acquired Western and folded the Parts America stores into its operations; Western's retail division ceased to exist.

> FN2. Appellee Rich quit before his job was otherwise terminated.

Each of the Appellees claim they were subjected to a racially hostile work environment, and are the victims of disparate treatment and disparate impact. [FN3] Essentially, their theory is that a policy of segregation limited the opportunities of African-Americans within Western's retail division, ultimately leading to a disparate impact on African-Americans when Western converted its stores and eliminated its retail division. [FN4] Although they were aware of the impending conversion, they were unaware of the policy of segregation until a Regional Vice President of Western, Don Lockard, testified in another matter indicating such a policy existed. Thereafter, Appellees brought suit, and filed a motion for class certification which the district court granted.

> FN3. *Appellee Bridget Drayton:*
> Bridget Drayton was hired as a cashier with Western in 1989. As alleged in the complaint, Drayton complained to management about her wages in 1990, claiming she was paid less than another cashier who was white, and also claimed a white manager called her racially derogatory names. As a result of her complaint to management, Drayton was suspended; thereafter, she quit. In 1991, she reapplied for a position with Western and was rehired. Due to Western's conversion to Parts America stores, Drayton's job was terminated in 1998. Drayton asserts she made several attempts

to be promoted above the level of cashier during her term of employment with Western, but was unsuccessful because Western failed to provide training, did not post job openings, and utilized a subjective decision-making process. Drayton also alleges she was subjected to a racially hostile work environment.

*Appellee Wanda Gibbs Mitchell:*
Wanda Gibbs Mitchell was hired as a part-time cashier with Western in 1985. She later became a full-time cashier before being promoted to lead cashier. As alleged in the complaint, during the early 1990's, and again in 1997, Mitchell was called racially derogatory names by a white manager, although she never complained to management. She did complain to management regarding her wages. Mitchell was paid less than a white cashier; however, when the white cashier left Western, Mitchell became the highest paid cashier in the store. Due to Western's conversion to Parts America stores, Mitchell's job was terminated in 1998. Mitchell asserts she made several attempts to be promoted above the level of cashier during her term of employment with Western, but was unsuccessful because Western failed to post job openings and utilized a subjective decision-making process. Mitchell also alleges she was subjected to a racially hostile work environment.

*Appellee Anthony Rich:*
Anthony Rich was hired as a mechanic with Western in 1995. Shortly thereafter, Rich complained to management about his wages, claiming he was paid less than a white mechanic. Based on his complaint to management, Rich's wage was increased to equal that of the white mechanic's wage. As alleged in the complaint, Rich expressed interest in applying for a management position, but was not provided with the necessary training. After the conversion to Parts America stores was announced, management positions in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.3d          FOR EDUCATIONAL USE ONLY                    Page 3

2002 WL 32508918 (11th Cir.(Fla.))

**(Cite as: 2002 WL 32508918 (11th Cir.(Fla.)))**

Rich's area were no longer available and, in 1997, he left his job.

Rich asserts his promotion attempts were unsuccessful because Western failed to post job openings and utilized a subjective decision-making process. Rich also alleges he was subjected to a racially hostile work environment.

FN4. The alleged policy of segregation consisted of matching the racial composition of a store to the racial composition of the neighborhood in which the store was located.

## II. DISCUSSION

We review *de novo* whether the named plaintiffs have standing to assert their claims. *See Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir.1987). Findings of fact relating to the timeliness of claims are reviewed for clear error. *See Ross v. Buckeye Cellulose Corp.,* 980 F.2d 648, 660 (11th Cir.1993). We review the district court's grant of class certification for abuse of discretion. *See Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014, 1022 (11 th Cir.1996). Whether the district court applied the wrong legal standard is reviewed *de novo. See Andrews,* 95 F.3d at 1022.

*2 To maintain a class action the individual named plaintiffs must establish three initial requirements: they must have standing to raise the claims before the court, they must meet the requirements of Rule 23(a) [FN5] to represent a class, and the class they seek to represent must be one of the types recognized by Rule 23(b). [FN6] *Griffin,* 823 F.2d at 1482. On appeal, Appellants raise three challenges, the first two of which address the initial requirements for class certification: (1) Appellees lack standing to raise the class claims or seek injunctive relief; (2) Appellees are inadequate class representatives under Rule 23(a); and (3) the district court failed to perform the appropriate analysis in determining class certification.

FN5. Rule 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all only

if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

FN6. Rule 23(b) provides:
An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
(1) the prosecution of separate actions by or against individual members of the class would create a risk of
(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32508918 (11th Cir.(Fla.))

**(Cite as: 2002 WL 32508918 (11th Cir.(Fla.)))**

against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Under Rule 23(c), [FN7] district courts are encouraged to decide class certification at an early stage in the process. At the same time, they are making a decision based on an undeveloped record and, thus, need to continue to monitor the class so it may decertify the class as soon as possible if certification is no longer appropriate. In this case, the district court is aware of its obligations, and has stated it will review the appropriateness of its decision and will "modify or vacate its certification order, should the interests of justice so require, as this case progresses."

> FN7. Rule 23(c) provides: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

A. *Standing*

Appellants present three arguments challenging Appellees' standing: (1) Appellees did not personally suffer the injuries giving rise to the claims; (2) Appellees' claims are time-barred; and (3) Appellees have not alleged an imminent threat of future harm for purposes of seeking injunctive relief.

1. *Injury In Fact.*

Any analysis of class certification must begin with the issue of standing. *Griffin,* 823 F.2d at 1482. Principles of standing require plaintiffs to establish they were injured. *Id.* at 1482-83. In the context of a class action, at least one of the named plaintiffs must have personally suffered the injury giving rise to each claim; it is insufficient for unnamed

members of the alleged class to have suffered the injury. *Id.* at 1483.

Appellees seek to represent a class of employees injured as a result of a racially hostile work environment, discriminatory practices in determining pay, training, and promotion, and discriminatory policies which led to a disparate impact on African-Americans when certain job positions were eliminated. Appellees also seek to represent a class of applicants subjected to discriminatory hiring practices by a policy of segregation which matched the racial composition of a store to the racial composition of the neighborhood in which the store was located. Appellants present three challenges to these allegations: (1) the hostile working environment claim cannot succeed because any allegedly hostile environment was not sufficiently severe or pervasive; (2) the disparate impact claim cannot be raised because it was not previously raised in an EEOC complaint; and (3) Appellees, as former employees, cannot represent job applicants.

*3 First, Appellants challenge the hostile work environment claim asserting the claim cannot succeed as a matter of law because the hostile environment was not sufficiently severe or pervasive to alter the terms or conditions of employment. Appellants' assertion is premature; this challenge addresses the merits of the claim and not standing.

Second, Appellants argue Appellees cannot raise their disparate impact claim because Appellees did not raise termination as an issue in their EEOC complaints. A judicial complaint, however, may vary from an EEOC complaint to the extent the claims are "like or related," or grow out of the initial allegations. *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 928 (11th Cir.1983). The EEOC complaints filed by Appellees alleged discrimination in promotional and employment opportunities. According to Appellees, these acts of discrimination resulted in the elimination of Appellees' jobs. Thus, the discrimination alleged in the present case is "like or related," or grew out of, Appellees' EEOC complaints alleging denial of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32508918 (11th Cir.(Fla.))

**(Cite as: 2002 WL 32508918 (11th Cir.(Fla.)))**

promotional and employment opportunities.

Third, Appellants assert Appellees lack standing to represent a class of job applicants because Appellees, as employees, were not denied positions with Western for discriminatory reasons. In a seminal case the Supreme Court addressed "across-the-board" class certifications including both job applicants and employees, significantly narrowing the circumstances under which such broad certification would be appropriate under Rule 23. *See General Tel. Co. of the S.W. v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Discussing the commonality and typicality requirements of Rule 23(a), the Supreme Court recognized limited circumstances under which a broad class certification might be appropriate: "significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decision making processes." *Falcon,* 102 S. Ct 2371 n . 15.

Nonetheless, as we noted in *Griffin,* as an initial matter Appellees need to have constitutional standing, even if they would be able to satisfy *Falcon's* requirements for representative capacity to assert claims on behalf of job applicants. [FN8] *See Griffin,* 823 F.2d at 1484. In *Griffin,* an employee initially filed suit alleging injury as a result of his employer's discipline and promotion practices. *See id.* at 1479. He also challenged his employer's use of an entry-level examination which allegedly detrimentally impacted the hiring of black employees. *See id.* Because the named plaintiff employee had already met the educational and testing requirements for his job, we concluded he lacked standing to challenge the entry-level examination. *See id.* at 1483. Likewise, Appellees lack standing to challenge Appellants' hiring practices or to represent job applicants because each Appellee was hired at the store where he or she applied for a position.

FN8. We do not express an opinion as to whether Appellees would, in fact, be able

to meet such a stringent standard of proving Western's policy of segregation affected both employees and applicants in the same general fashion.

*2. Timeliness of Claims.*

**\*4** Appellants argue Appellees' claims are time-barred. In response, Appellees assert their claims are timely based on the doctrine of equitable tolling. "Under equitable tolling, Title VII's statute of limitations does not start to run until a plaintiff knew or reasonably should have known that she was discriminated against." *Carter v. W. Publ'g Co.,* 225 F.3d 1258, 1265 (11th Cir.2000). Even though they were aware of Western's impending conversion to Parts America stores, Appellees assert they were not aware of Appellants' segregation policy until Don Lockard's testimony. Only upon hearing about the segregation policy through Lockard's testimony did Appellees begin to suspect a policy of discrimination that impacted their positions. The district court agreed, stating it was not "convinced" Appellees should have known about Appellants' discriminatory segregation policy until Lockard's testimony, which was within 300 days of filing their EEOC complaints.

We rely on the district court's willingness to modify or vacate its order as this case progresses, and conclude it was not clear error for the district court to find Appellees did not know, or reasonably should not have known, they were being discriminated against with regard to the disparate impact claim, and related disparate treatment claims, prior to learning about the alleged policy of segregation. Equitable tolling applies to all of Appellees claims, except for the wage discrimination claim; [FN9] however, Appellants acknowledge that one of the Appellees has an appropriate § 1981 wage claim, therefore, at least one Appellee has standing for such a claim and that is all that is required to maintain the class. *See Griffin,* 823 F.2d at 1482.

FN9. Each of the Appellees specifically complained to management regarding wage discrimination. According to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32508918 (11th Cir.(Fla.))

**(Cite as: 2002 WL 32508918 (11th Cir.(Fla.)))**

Appellants, these complaints were rectified long before the limitations period expired for two of the Appellees. Thus, those two Appellees reasonably should have known they were being discriminated against long before they were required to file an EEOC claim, and equitable tolling would not apply to save their claim under Title VII.

*3. Injunctive Relief under Rule 23(b)(2).*

Certification under Rule 23(b)(2) [FN10] is applicable when final injunctive relief or corresponding declaratory relief with respect to the class as a whole is appropriate. *See* Fed.R.Civ.P. 23(b)(2). A civil rights plaintiff seeking prospective injunctive relief must demonstrate a "real and immediate" threat of future injury. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (holding plaintiff could not seek injunctive relief prohibiting Los Angeles police officers from utilizing a "chokehold" maneuver because there was no real and immediate threat the plaintiff would be arrested in the future); *Johnson v. B. of Regents of the Univ. Of Ga.,* 263 F.3d 1234 (11th Cir.2001) (holding former applicants for admission to freshman class at state university, denied admission due to use of unconstitutional admission standards, did not have standing to seek prospective injunctive relief absent showing of likelihood they would ever again be subjected to freshman admissions process); *Shotz v. Cates,* 256 F.3d 1077, 1081-82 (11th Cir.2001) (holding plaintiffs alleging violation of the ADA in a county courthouse do not have standing to seek injunctive relief because they have not alleged an immediate and real threat of future injury only past incidents of discrimination); *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999 (11th Cir.1997) (holding former employees of motel chain did not have standing to seek injunctive relief because they did not allege they would be discriminated against in the future). "[T]his Court has held that former employees who submit no fact that they will be discriminated against in the future lack standing to seek an injunction." *Jackson,* 130 F.3d at 1007.

FN10. This class was certified under both

Rule 23(b)(2) and (b)(3). Only the Rule 23(b)(2) class certification has been directly challenged on the grounds injunctive relief is not appropriate for this class. Certification under Rule 23(b)(3) is applicable where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

*5 Appellants argue Appellees lack standing to seek injunctive relief under Rule 23(b)(2) because they are former employees who have not submitted facts establishing future harm is imminent. Appellants further argue injunctive relief is not appropriate against Appellant Advance under theories of successor liability. [FN11] The only response provided by Appellees to Appellants' argument was to note Appellee Drayton has requested reinstatement.

FN11. Whether a successor corporation should be liable for the unfair labor practices of its predecessor is a fact-specific balancing-of-interests analysis. *See In re Nat'l Airlines, Inc.,* 700 F.2d 695, 698 (11th Cir.1994). This appeal addresses class certification and, therefore, we need not determine the issue of successor liability at this time. *See Carter,* 225 F.3d at 1262 ("We agree with plaintiffs that Rule 23(f) limits our review to the district court's order granting class certification.").

Appellants challenge whether Drayton has a valid reinstatement claim. It is undisputed Drayton was offered a position, for a greater salary, at Western after her job was initially terminated, and she refused to accept it. "Once [a good-faith] offer is made, claimants forfeit their right to reinstatement unless their refusal of the employer's offer is reasonable." *Stanfield v. Answering Serv., Inc.,* 867 F.2d 1290, 1295-96 (11th Cir.1989). Even assuming Western's job offer was unreasonable,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.3d                    FOR EDUCATIONAL USE ONLY                    Page 7

2002 WL 32508918 (11th Cir.(Fla.))

(Cite as: 2002 WL 32508918 (11th Cir.(Fla.)))

Drayton now seeks injunctive relief from an entity Appellees do not claim engages in a policy of discrimination. All allegations of discrimination set forth in Appellees' operative complaint concern Western and its alleged policy of segregation. Western, however, no longer exists; it has been acquired by Advance. Thus, any potential future injury would be speculative.

Furthermore, the likelihood Drayton is subject to a real and immediate threat of injury from Advance is too tenuous and hypothetical to establish standing to seek injunctive relief on behalf of a class. *Shotz,* 256 F.3d at 1081-82 ("because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges ... a real and immediate-as opposed to a merely conjectural or hypothetical-threat of future injury"). Having failed to allege a real and imminent threat of future discrimination, Appellees do not have standing to pursue a Rule 23(b)(2) class action for injunctive relief.

B. *Adequacy of Class Representatives*

Appellants argue Appellees should not be designated class representatives because they will not "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To determine the adequacy of Appellees, it is necessary to examine whether (1) the class representatives have common interests with the unnamed members of the class, and (2) the interest of the class will be vigorously prosecuted through qualified counsel. *See Gonzales v.. Cassidy,* 474 F.2d 67, 72 (5th Cir.1973). [FN12] Only the first criteria of this test is challenged by Appellants.

> FN12. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981)(en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

The Civil Rights Act of 1991 provided plaintiffs with the right to a jury trial, as well as to seek compensatory and punitive damages from an employer who engaged in unlawful intentional discrimination. *See* 42 U.S.C. § 1981(a); *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 407-09 (5th Cir.1998). Appellants challenge the adequacy of Appellees to represent the class because they have chosen to forego compensatory and punitive damages for the class while they pursue such damages for themselves on an individual basis. Both parties agree that, in this case, Appellees could not seek compensatory or punitive damages for the class. *See Allison,* 151 F.3d at 425 (holding a class of plaintiffs seeking compensatory and punitive damages may render class certification inappropriate if issues common to the proposed class do not predominate individual issues). Appellees contend they are in a "Catch 22" situation if they cannot seek such damages on behalf of the class and, yet, failing to do so renders them inadequate.

*6 While Appellees' interests in proving the disparate treatment and disparate impact claims may be aligned with the interests of the class members, Appellees are still pursuing remedies for themselves they are not seeking for the class; that is a conflict. As just one example of the potential conflict, Appellees could be influenced by their desire to maximize their individual gains in any negotiations for a class settlement. As representatives of a class, Appellees need to protect the interests of the class first and foremost; we cannot say Appellees "posses the same interest" in the litigation as the class. *Falcon,* 102 S.Ct. at 2370.

Appellees may pursue their individual claims for compensatory and punitive damages, or they may pursue the class claims. In their briefs and at oral argument, Appellees represented they are willing to abandon their individual claims, if asked by the court, in order to represent the class. We affirm based on Appellees' representation.

C. *Rigorous Analysis*

Appellants assert the district court failed to perform the appropriate analysis and applied the wrong legal standard in certifying this case when it accepted the substantive allegations contained in Appellees'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint as true. [FN13] In determining whether the Rule 23 requirements have been met for class certification purposes, however, a district court does not address the merits of the claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 2152-53, 40 L.Ed.2d 732 (1974). It, therefore, is proper to accept the substantive allegations contained in the complaint as true when assessing Rule 23 requirements.

FN13. Appellants also assert a collateral consequence of the district court's acceptance of Appellees' substantive allegations was the district court's acceptance of the statistical analysis presented by Appellees. Appellants challenge Appellees' statistical evidence as methodologically infirm, and contend the district court should have performed its gatekeeping responsibility by performing a *Daubert* analysis. *See Daubert v. Merrill Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In addressing the statistical evidence proffered by both parties' experts the district court stated: "The parties in this case present a battle of statistical experts. The Court finds it inappropriate to determine the ultimate correctness of either parties contentions in the context of class certification." Appellants assert the district court "abdicated its duty to evaluate the reliability of [the expert's] methodology" and requests that we do so *de novo.* We will not do so. Appellants have presented no authority establishing a court must perform a *Daubert* inquiry of scientific evidence at this early stage of a class action proceeding. The district court indicated it will address this issue as this case progresses, which we find sufficient.

Nonetheless, the district court stated it carefully reviewed "the pleadings, motions, declarations, affidavits, depositions, statistical analyses, and other materials in the court file." The district court also acknowledged a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." The district court appropriately analyzed all the evidence before it in determining whether class certification was appropriate under the requirements of Rule 23.

III. CONCLUSION

We reiterate the importance of monitoring class certification and making any necessary modifications. Nonetheless, Appellees have standing to raise the majority of their claims; Appellees do not have standing to raise the claims of applicants, or to seek injunctive relief under 23(b)(2). Additionally, Appellees must abandon their individual claims seeking compensatory and punitive damages if they seek to represent the class. Accordingly, the district court's certification of the class under Rule 23(b)(3) is affirmed to the extent (1) Appellees abandon their individual claims seeking compensatory and punitive damages, and (2) the class is defined to exclude job applicants. We reverse the district court's certification of the class under Rule 23(b)(2).

AFFIRMED in part, REVERSED in part, and REMANDED.

2002 WL 32508918 (11th Cir.(Fla.))

**Briefs and Other Related Documents (Back to top)**

- 2001 WL 34120429 (Appellate Brief) Appellee Brief of Plaintiffs (Apr. 05, 2001)Original Image of this Document (PDF)
- 01-10415 (Docket) (Jan. 25, 2001)
- 2001 WL 34120432 (Appellate Brief) Appellants' Brief (2001)Original Image of this Document (PDF)
- 2001 WL 34120434 (Appellate Brief) Appellants' Reply Brief (2001)Original Image of this Document (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.